PER CURIAM:
Prior to his resignation, John Young worked as a trader at Merrill Lynch & Co. While at Merrill Lynch he participated in the firm’s “Long-Term Incentive Compensation Plan for Managers and Producers” (LTICP or the Plan). Merrill Lynch contended that by resigning from the firm, Young lost his right to previously awarded, but unexercised, Restricted Units under the Plan. Young filed suit. The district court granted summary judgment to Young, holding — under the applicable standard of review — that Merrill Lynch’s interpretation of the Plan was arbitrary. We reverse.
I
John Young began working at Merrill Lynch as a structured credit trader in 2006, and held the title of managing director. While at Merrill Lynch he participated in the Plan. The Plan was designed to provide long-term incentives to key employees, to attract and retain top-flight *438 employees, to encourage long-term stock ownership by employees, and to align the interests of those employees with those of the stockholders. Under the Plan, the Management Development and Compensation Committee of the Board of Directors (the Committee) had “sole and complete authority,” “[s]ubject to the provisions of the Plan,” to administer and construe the Plan. The Plan stated that the Committee’s determinations “shall be final and binding.” The Plan was governed by New York law.
At issue in this case are 14,802 Restricted Units — each providing the right to receive one share of Merrill Lynch stock or its cash value — granted to Young in 2006 that have been heretofore unexercised. In general, employees lost their rights to Restricted Units not exercised when they left Merrill Lynch. Young asserted that he had a right to his Restricted Units under an exception to that general rule, stating that he left the firm for “Good Reason” after a “Change in Control.” These are both contractual terms drawn from the Plan.
Merrill Lynch executed an agreement and plan of merger with Bank of America on September 15, 2008, and the merger was to occur — and did occur — on January 1, 2009. Young received his 2008 bonus in December 2008, after the merger agreement was signed but before the merger was consummated. He resigned from Merrill Lynch in February 2009, roughly one month after the merger had occurred.
In § 8.1, the Plan granted participants the right of payment of the value of their unexercised Restricted Units if there was a corporate Change in Control and the participant was either terminated “without Cause” or resigned “for Good Reason.”[1] Young asserted that he had resigned for Good Reason following a Change in Control. Good Reason was defined in the Plan’s § 8.5, and certain diminutions in a Plan participant’s bonus after a Change in Control compared to previous bonuses constituted Good Reason. The parties do not dispute on appeal that Young would have had “Good Reason” if the December 2008 bonus, paid between the merger agreement’s signing and the consummation of the merger, had been instead paid after January 2009, when the merger occurred.
The parties have focused on whether the date of the Change in Control applicable to Young’s situation should be the date that the merger agreement was signed or the date that the merger occurred. The determination of when a Change in Control occurs was governed by § 8 of the Plan. As noted above, § 8.1 established the right of payment of the value of Restricted Units when an eligible employee left for Good Reason as defined in § 8.5. The title of § 8.2 was “A Change in Control,” and the sub-section defined it as an event “of a nature that would be required to be reported in response to Item 6(e) of Sehed *439 ule 14A of Regulation 14A promulgated under the Securities Exchange Act of 1984” and offered non-exclusive examples. The parties have stipulated that the Merrill Lynch-Bank of America merger on January 1, 2009 constituted a Change in Control under § 8.2. Young contends, however, that by virtue of § 8.3, whenever a merger agreement is executed, the date of the merger agreement and not the date that the merger actually occurs is deemed the operative Change in Control date. Section 8.3, titled “Effect of Agreement Resulting in Change in Control,” stated:
If ML & Co. executes an agreement, the consummation of which would result in the occurrence of a Change in Control as described in Section 8.2, then, with respect to a termination of employment without Cause or for Good Reason occurring after the execution of' such agreement (and, if such agreement expires or is terminated prior to consummation, prior to such expiration or termination of such agreement), a Change in Control shall be deemed to have occurred as of the date of the execution of such agreement.
Merrill Lynch responded to Young’s request for his Restricted Units by stating that it construed the date of Change in Control relevant to Young as the date of the consummation of the merger — which occurred after his bonus was paid. Thus, Merrill Lynch contended, his bonus could not be linked to the Change in Control and therefore Good- Reason was not established. In a second letter Merrill Lynch denied that § 8.3 controlled, stating that the provision relates only to those employees who “are terminated or resign for good reason prior to [the] closing of a transaction” by “ ‘deem[ing]’ ” the transaction to have occurred earlier. The parties have stipulated that the Committee in charge of administering the Plan met, in December 2008 before the merger was consummated and before Young resigned, and discussed potential treatments of the Plan’s benefits. The stipulation reflects that in December 2008, the Committee “addressed the subject of Merrill Lynch’s equity plans providing for possible treatments for employees’ stock-based awards upon termination, including terminations following a change in control, and the need to establish rules for interpreting plan provisions where termination rules had provided for several possible treatments for employees.” Merrill Lynch has represented and Young does not contest that Merrill Lynch has applied the date of the signing of the merger agreement, September 15, 2008, as the Change in Control date for those individuals who left the firm between the merger agreement’s signing and the consummation of the merger pursuant to its reading of § 8.3. The Committee did not apply the date that the merger agreement was signed to Young because he resigned after the merger actually occurred.
The parties filed cross-motions for summary judgment. The district court granted summary judgment in favor of Young and denied Merrill Lynch’s motion. It recognized that New York grants highly deferential review of a determination made by a committee vested with sole interpretive authority. Nonetheless, the court determined that the requisite decrease in Young’s bonus had been demonstrated and that the express language of § 8.3 compelled a determination that a Change in Control occurred on the date that the merger agreement was signed. This provided Young Good Reason for his resignation, the district court concluded. The court applied the same date to calculate the Units’ Pre-CIC Value.
Merrill Lynch now appeals to this court. Our jurisdiction over this appeal is properly vested pursuant to 28 U.S.C. § 1291.
*440 II
We review a grant or denial of summary judgment de novo, applying the same standards as the district court.[2] “The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.”[3]
The Plan is governed by New York law, under which our review is highly deferential. The Plan vested “sole and complete authority” to interpret its provisions in the' Committee. New York’s highest court held in Gitelson v. Du Pont that a plan vesting “[s]ole authority” in a board limited a court’s review of a payment denied by that board to a determination of whether the claimant met his burden “to show that the board’s ruling was motiváted by- bad faith, or arrived at by fraud or arbitrary action.”[4] This is so because New York considers such a payment right “a conditional contract right,” and therefore the payment right is subject to the contract’s conditions-—-including the sole authority provision.[5] The instant contract vested “sole and complete authority” in the Committee.
.Here there has been no allegation of bad faith or fraud. Therefore, we consider de novo whether Merrill Lynch’s interpretation of the Plan constituted an arbitrary action. New York law regarding arbitrary actions has been characterized as requiring a determination that an administrator’s decision lacks “any rational factual basis or was made without reference to relevant facts and contractual provisions.”[6] This has been termed a “heavy burden.”[7]
Our inquiry is guided by a previous decision of this court. In Matthews v. Swift & Co., we interpreted a “sole discretion” provision in a contract under New York law. There, we applied Gitelson’s deferential standard of review.[8] Here, as in Matthews, no party has argued that it contravenes our public policy to apply this New York standard of review.[9]
In Matthews we strove to uphold the strong deference of the relevant standard. In evaluating the decision of a pension board with respect to a purported “permanent disability,” we cautioned that “the discretion of the judge cannot be substituted for that of the [pjension [bjoard without departing from the terms of the contractual obligation.”[10] Therefore, we held that the claimant “ha[d] the burden of proving such a clear case of permanent disability that no honest tribunal could reach any other decision and the burden of proving that any other decision is or would be arbitrary, fraudulent or in bad faith.”[11] In the instant case, Young has the resulting burden to show that no honest tribunal could have construed the Plan in any man *441 ner but his proffered reading and that Merrill Lynch has advanced an arbitrary reading.
Young has not carried that burden. Looking at the relevant facts and provisions, Merrill Lynch concluded that § 8.2 dictated that the merger’s consummation date was the Change in Control date for those individuals who resigned after the agreement was signed and after its consummation. Merrill Lynch construed § 8.3 as providing a “deemed” date for the Change in Control only for those who left Merrill Lynch between the merger’s signing and consummation. Indeed, the parties have stipulated that consummation of the merger agreement on January 1, 2009 “resulted in the occurrence of a ‘Change in Control,’ as described in Section 8.2.” Accordingly, there are two Change in Control dates potentially applicable. The question is which applies when the bonus payment amounting to “Good Cause” occurs after the date the merger agreement was signed but before the merger actually occurs, and Young’s termination of his employment occurred after the later of the two Change in Control dates. The Plan does not so clearly support Young’s position that the Committee’s interpretation of the Plan was arbitrary. In fact, Young’s construction of the Plan reads the actual date of the merger, which the parties have stipulated constituted a Change in Control, out of the Plan entirely in a merger situation. According to Young, the only Change in Control date that can apply once a merger agreement has been signed is the date of the signing of that agreement. The actual date the merger occurs is irrelevant, according to Young, all because of § 8.3. We submit that the meaning of § 8.3 is not so clear, either standing alone or when considered with other provisions of the Plan.
The Plan provides in § 8.1 that “[i]n the event a Change in Control shall occur and thereafter ... the Participant shall terminate his or her employment with the Company for Good Reason, the Participant shall be paid ...” (emphasis added). A plausible construction of this provision is that both the termination as well as the Good Cause must occur after the same Change in Control date. Young’s Good Cause occurred after a Change in Control, if the merger agreement’s signing date is deemed a Change in Control, but he terminated his employment after a subsequent and different Change in Control date, January 1, 2009, when the merger actually occurred.
Merrill Lynch has essentially construed the Plan as providing two separate periods of time within which within there could have been resignations for Good Reason. To put it somewhat colloquially, the clock for resignations based on Good Reason in the run-up-to-the-merger era began to run on the signing date of the agreement, and that clock ran out when the merger, which both parties agree was a Change in Control, actually occurred. Resignations referable to actions taken within that premerger window must occur within that window. For employees who remained to see what the merged company might hold for them, a new Change in Control date governed, January 1, 2009. Resignations occurring after that date would have to be based on Good Reason occurring after that date.
Another plausible construction of the Plan, which Merrill Lynch did not adopt and Young does not embrace, is that § 8.3 is designed to apply, and “a Change in Control shall be deemed to have occurred as of the date of the execution of’ a merger agreement, if and only if “such [merger] agreement expires or is terminated prior to consummation” of the merger. In other *442 words, § 8.8 applied only in the circumstance in which a merger agreement is signed, but the merger does not occur. Under such circumstances, it is necessary to deem a Change in Control date because no Change of Control actually occurred. Applying this interpretation, an employee who received a smaller-than-previous-years’ bonus after a merger agreement was signed would be entitled to the value of Restricted Units if she terminated her employment for Good Reason before the merger agreement expired or was terminated. She would not, however, have grounds to receive the value of Restricted Units if she resigned after the merger agreement expired or terminated.
Other scenarios are possible and other interpretations of the Plan would not be arbitrary. Hypothetically at least, it could not be known in some situations whether the merger would occur on January 1, 2009, as contemplated, until more than thirty days after a resignation. For example, if an employee resigned for Good Reason on November 1, 2008, payment was due well before January 1, 2009 because, under § 8.1, employees who resigned for Good Reason were entitled to receive the value of their Restrictive Units within thirty days after their resignation. Section 8.3 could be read as deeming the applicable control date for such employees to be the date that the merger agreement was signed.
Though Young offers another alternative reading of the Plan, he fails to carry his “heavy burden.”[12] He asserts that the text of the Plan unambiguously supports his reading. But our task is not to construe the Plan as a matter of first impression, but rather to evaluate whether Merrill Lynch acted arbitrarily in its construction of the Plan. As noted above, Merrill Lynch’s interpretation was not arbitrary.
Similarly unavailing is Young’s passing contention that § 8.6 of the Plan precluded Merrill Lynch from interpreting the Plan to ascertain the Change in Control date. Section 8.6 limits Merrill Lynch’s exercises of discretion that “would have the effect of diminishing a Participant’s rights,” but that provision cannot reasonably be construed to divest the Committee of the right to determine how the Plan would be applied categorically before the merger took effect to ascertain, in the first instance, whether a Participant had rights.
As we have observed, our jurisprudence indicates that Young must show that “no honest tribunal could reach any other decision.”[13] We note that in Glickman v. Bank of America Corp., in an oral decision, a New York court considered the Change in Control date under § 8.3 and its effect on share valuation for employees who left the firm after the merger closed.[14] That tribunal concluded that an agreement that applied Merrill Lynch’s theory of the interplay of §§ 8.2 and 8.3 was “consistent with the [P]lan.”[15]
As Merrill Lynch’s interpretation of the Plan was not arbitrary, its appeal regarding the date to be used for the pre-CIC Value is moot.
Ill
The dissent would expand the range of situations in which this court will substitute its own judgment for that of an entity *443 vested with sole authority under a contract, despite this court’s explicit fear of “doing violence” to a sole authority provision in such a manner.[16] The dissent reads Matthews as “deferring to the board’s discretionary interpretation only where the language is ‘so indefinite’ and has ‘an infinite number of meanings.’”[17] However, this court held in Matthews that the only situation in which we would substitute our own judgment for the board’s is when observers would “necessarily conclude” that an interpretation adopted by an administrator was unsupported by a plan’s terms.[18] As we stated, “In all other cases the discretion of the judge cannot be substituted for that of the Pension Board without departing from the terms of the contractual obligation.”[19] Thus, we do not require a provision to have “infinite” meanings, but rather it need only have more than a single viable meaning, to vest the board with the discretion incumbent in the contractual provision.
Further, the dissent minimizes the effect of § 8.2 of the Plan by declaring it “purely definitional,” and therefore without operative effect.[20] Yet, the term “Change in Control,” as defined in § 8.2, goes to the crux of operative language elsewhere in the Plan. Here, the parties stipulated that the merger’s consummation in January 2009 “resulted in the occurrence of a ‘Change in Control,’ as described in Section 8.2” of the Plan. There is room for reasonable disagreement about which of two potential Change of Control dates applies to those in Young’s situation.
The dissent also raises a series of issues with this court’s Matthews precedent and its relationship to New York’s Glickman v. Bank of America Corp. The dissent begins by taking issue with Matthews’ holding and the language therein requiring that a claimant demonstrate that “no honest tribunal could reach any other decision,” questioning its foundation in New York law.[21] But Matthews provides this court’s interpretation of the New York test enunciated in Gitelson v. Du Pont that is applicable to the instant case.[22] It is the Mattheios test that we are bound to apply, since “the rule of orderliness forbids one of our panels from overruling a prior panel.”[23]
Alternatively, the dissent contends that this court should not defer to the New York trial court in Glickman if we conclude that Merrill Lynch acted arbitrarily in interpreting the Plan.[24] This is — of course — correct: Matthews does not direct us to defer blindly to any court’s decision supporting a particular reading of the Plan. Matthews held that the burden was on the claimant to show “that no honest tribunal could reach any other decision and the burden of proving that any other decision is or would be arbitrary, fraudulent or in bad faith.”[25] Thus, if we conclude that a given interpretation is arbitrary, another court’s contrary holding is not a bar to our action. Instead, it is incumbent for us to *444 distinguish those contrary decisions, either as a decision .that an “honest tribunal could [not] reach” or as answering a discrete question.
The dissent, in fact, contends that Glickman is distinguishable from the instant case.[26] But that case addressed the accuracy of Merrill Lynch’s interpretation of the Change in Control date under the Plan. Indeed, in Glickman, the court’s belief that Merrill Lynch had correctly interpreted the Plan in applying Change in Control dates was, at the least, an alternative basis for its holding. The court explicitly rejected the contention that the reading of the Plan advanced by Merrill Lynch in this case constituted a “change in the terms” of the Plan.[27] It then issued its ruling that Merrill Lynch’s valuation was “consistent with the [P]lan.”[28]
We REVERSE and RENDER judgment for Merrill Lynch.

. Section 8.1 provides:
Section 8.1 Value of Payments Upon Termination After a Change in Control.
Any other provision of the Plan to the contrary notwithstanding and notwithstanding any election to the contrary previously made by the Participant, in the event a Change in Control shall occur and thereafter the Company shall terminate the Participant's employment without Cause or the Participant shall terminate his or her employment with the Company for Good Reason, the Participant shall be paid the value of his or her Performance Shares, Performance Units, Restricted Shares, Restricted Units, Stock Options, Stock Appreciation Rights, and Other ML & Co. Securities in a lump sum in cash, promptly after termination of his or her employment but, without limiting the foregoing, in no event later than 30 days thereafter.

. Robinson v. Orient Marine Co. Ltd., 505 F.3d 364, 365 (5th Cir.2007) (citing Gowesky v. Singing River Hosp. Sys., 321 F.3d 503, 507 (5th Cir.2003)).

. Fed.R.Civ.P. 56(a).

. 17 N.Y.2d 46, 268 N.Y.S.2d 11, 215 N.E.2d 336, 337-38 (1966).

. Id., 268 N.Y.S.2d 11, 215 N.E.2d at 338.

. Brooks v. Cohen & Steers, Inc., 30 A.D.3d 202, 817 N.Y.S.2d 235, 236 (2006) (citing Gehrhardt v. Gen. Motors Corp., 581 F.2d 7, 12 (2d Cir.1978)).

. Gehrhardt, 581 F.2d at 11.

. 465 F.2d 814, 817-18 (5th Cir.1972).

. Id. at 818.

. Id. at 820-21.

. Id. at 821.

. Gehrhardt, 581 F.2d at 11.

. Matthews, 465 F.2d at 821.

. Glickman v. Bank of America Corp., No. 603651/09, at *17 (N.Y.Sup.Ct., N.Y.Cnty. Apr. 26, 2010).

.Id. at *20.

. Matthews, 465 F.2d at 820.

. Dissent at *445.

. Matthews, 465 F.2d at 820-21.

. Id. at 821.

. Dissent at *447, 448-49.

. Id. at *449-50 (citing Matthews, 465 F.2d at 821).

. 465 F.2d at 819 (citing 17 N.Y.2d 46, 268 N.Y.S.2d 11, 215 N.E.2d 336 (1966)).

. Teague v. City of Flower Mound, Tex., 179 F.3d 377, 383 (5th Cir.1999).

. Dissent at *449 (citing No. 603651/09, at *1 (N.Y.Sup.Ct., N.Y. Cnty. Apr. 26, 2010)).

. 465 F.2d at 821.

. Dissent at *449-50.

. Glickman, No. 603651/09, at *20.

. Id.