**Revised February 25, 2003**

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

**No. 02-60283**
_____

**BRENDA A. GOWESKY, M.D.,**

**Plaintiff-Appellant,**

**versus**

**SINGING RIVER HOSPITAL SYSTEM,
d/b/a OCEAN SPRINGS HOSPITAL,**

**Defendant-Appellee.**

_____

**Appeal from the United States District Court
for the Southern District of Mississippi**
_____

February 6, 2003

Before GARWOOD, JONES, and STEWART, Circuit Judges.

EDITH H. JONES, Circuit Judge:

This is an appeal from the district court's grant of summary judgment to defendant Singing River Hospital Systems ("Singing River") on plaintiff Brenda A. Gowesky's ("Gowesky") ADA claims for disability-based workplace harassment and employment discrimination. 42 U.S.C. § 12112(a); see also Flowers v. S. Reg'l Physician Servs., Inc., 247 F.3d 229 (5th Cir. 2001). Gowesky has not created a material fact issue concerning whether she was "regarded as disabled" by her employer after undergoing successful

treatment for hepatitis C infection; nor has she surmounted the evidentiary burden concerning disability-based harassment or an adverse employment decision. We affirm the summary judgment.

## I. FACTS

On February 26, 1997, while attending a patient in the emergency room of Ocean Springs Hospital (owned by Singing River), Gowesky was accidentally exposed to the hepatitis C. virus. On March 20, she informed Dwight Rimes, Administrator of the Ocean Springs Hospital, that she had tested positive. She ceased active work at the hospital several days later (March 26), but maintained staff privileges and continued to attend monthly staff meetings. This practice persisted for the next two years, even as she underwent chemotherapeutic treatment for her infection.

On February 8, 1999, following one of these meetings, Gowesky informed Rimes that the virus had gone into remission and that she wanted to return to work at the end of May, following her upcoming carpal tunnel surgeries. Gowesky testified in deposition that

> Mr. Rimes told me that he wasn't sure that I could work in the Emergency Department with this hepatitis C, that he was going to the hospital attorneys to find out if I could work and he said I would have to do some refresher courses, that I would have to get clearance from physicians, and he wanted clearance from Dr. Schiff because the local physician wasn't [acceptable]. I had to make sure that I wasn't having any more problems with my hands, I'd have to have weekly blood draws.

2

Gowesky further asserts that Rimes "[s]aid to me not only that he didn't think that I could work in the Emergency Room with hepatitis C, that he wouldn't go to a dentist with hepatitis C and he would not let me suture his child."

At this time, she also spoke with Dr. John Weldon, Director of Emergency Medicine at Ocean Springs Hospital and her immediate supervisor, who, she alleges, threatened her and told her that, if she returned to work, she would have to guarantee that there would be no problems, that she would be able to do the work, and that she would not be infectious. He further questioned Gowesky on whether she knew of any other emergency room physicians with hepatitis C.

At a staff meeting on March 22, Weldon gave Gowesky a copy of the emergency room staffing schedule for the months of June, July, and August; she was slated to return to work on June 1.

Between this meeting and her scheduled return date, Gowesky underwent her two surgeries (March 23 and April 19) and reaffirmed her commitment to resume her duties. In a letter dated March 26, Gowesky told Rimes that she would indeed attend a refresher class and provide a letter from her physician confirming her ability to resume work.

In the meantime, Singing River had been engaged in corporate restructuring. One feature of the plan involved the transfer of emergency room staffing responsibilities from Singing

3

River Hospital Systems to the Emergency Room Group, Ltd. ("ERG"). September 1 was the anticipated transfer date. On or about May 31, Singing River gave each of the emergency room physicians in its employ at Ocean Springs a formal 60-day termination notice. As with other emergency room physicians, Gowesky received this release from Singing River and a promise of future employment from ERG.

Gowesky's receipt of this notice appears to have marked a low point in her relationship with Rimes and Weldon. In February, she was surprised by their imposition of conditions upon her return and offended by their comments; over the following four months she claims to have engaged in numerous other conversations in which they made other offensive remarks; and in May she thought they fired her. Upset by this apparent indignity, she telephoned Rimes to tell him that she objected to her dismissal. (Her suspicion was, however, unfounded.) She did not report to work on June 1. A letter from her attorney followed on July 29, in which he stated that Gowesky would not return to work, as re-scheduled, on August 1.

Contrary to Singing River's expectations, the corporate restructuring was still in limbo when the emergency room staffing contracts expired at the end of August. For the entire month of September, Ocean Springs Hospital's emergency room physicians worked without contract. At the start of October, however, when it appeared that the transition was not imminent, Ocean Springs Hospital offered all of its emergency room physicians interim

4

contracts. Upon consummation of the corporate transition in February 2000, these physicians received permanent contracts from ERG. Gowesky did not enter into either contract.

Gowesky filed her complaint against Singing River on June 9, 2000, alleging gender- and disability-based discrimination. The district court granted Singing River's motion for summary judgment on March 14, 2002. Gowesky now appeals only the district court's disposal of her ADA claims.

## II. STANDARD OF REVIEW

> We review de novo a district court's grant of summary judgment, applying the same standard as the district court. See Walker v. Thompson, 214 F.3d 615, 624 (5th Cir. 2000). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). "If the moving party meets the initial burden of showing there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." Allen v. Rapides Parish Sch. Bd., 204 F.3d 619, 621 (5th Cir. 2000) (internal quotations and citation omitted). Doubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party. See Burch v. City of Nacogdoches, 174 F.3d 615, 619 (5th Cir. 1999).

Evans v. City of Bishop, 238 F.3d 586, 588–89 (5th Cir. 2000)

## III. DISCUSSION

Gowesky brings two claims to the court. She alleges that she was the victim of disability-based (1) workplace harassment and

5

(2) employment discrimination. A common element to both claims is that the plaintiff be "disabled." Before addressing her claims individually, this court will consider this threshold requirement to both.

## A. Gowesky Was Not "Regarded as Disabled"

Gowesky does not assert that, as a result of her hepatitis C infection, she was disabled, in a conventional sense, under the ADA. As defined by the Act, a "disability" is a "physical or mental impairment that substantially limits one or more . . . major life activities." Americans with Disabilities Act of 1990, 42 U.S.C. § 12102(2)(A). The ability to engage in gainful employment is one such activity. See Regulations to Implement the Equal Employment Provisions of the Americans with Disabilities Act, 29 C.F.R. § 1630.2(i).

The ADA's definition of "disability" does, however, permit suits by plaintiffs who, though not actually disabled per § 12102(2)(A), are nonetheless "regarded as having such an impairment." 42 U.S.C. § 12102(2)(C). This court, citing the applicable regulations, has set out the manner in which one might establish such a claim:

> One is regarded as having a substantially limiting impairment if the individual (1) has an impairment which is not substantially limiting but which the employer perceives as constituting a substantially limiting impairment; (2) has an impairment which is substantially limiting only because of the attitudes of others toward such an impairment; or (3) has no impairment at all but

6

is regarded by the employer as having a substantially limiting impairment.

<u>Bridges v. City of Bossier</u>, 92 F.3d 329, 332 (5th Cir. 1996).

Gowesky alleges that, though not disabled under subsection (A), she was "regarded as disabled" by her supervisors under subsection (C). This is evidenced, she argues, by their questions and remarks regarding her ability to return to work in the emergency room.

With her assertion this court cannot agree. At most, the comments cited by Gowesky question her fitness to practice emergency room medicine, a professional calling in which routine exposure to blood and bodily fluids might allow the hepatitis C virus to spread. The supervisors' remarks, no matter how uninformed, do not suggest Gowesky was otherwise unable to work as a doctor in a less-exposed or -exposing environment. The EEOC regulations make plain that an inability to perform one particular job, as opposed to a broad range of jobs, does not constitute an impairment that substantially limits one's ability to work. 29 C.F.R. § 1630.2(j)(3)(i). This court has enforced the regulatory distinction. <u>See</u> <u>Bridges</u>, 92 F.3d at 332 & n.3; <u>Dutcher v. Ingalls Shipbuilding</u>, 53 F.3d 723, 726–28 (5th Cir. 1995).

Equally detrimental to her claim is the hospital's point that Gowesky could not have been regarded as disabled by the supervisors because they kept reassigning her to the emergency room schedule. It was Gowesky who repeatedly declined to return to work.

7

She cannot succeed on the "regarded as disabled" element of either claim when her employer never limited her job duties or hindered her return to the full range of duties.

On the basis of this conclusion alone, this court concludes that Gowesky's two claims must fail. For the purposes of a complete analysis, however, we will consider other elements of her two claims, assuming for the sake of argument that Gowesky could have been "regarded as disabled" by Weldon and Rimes.

**B.   Disability-Based Harassment Claim**

In 2001, this court recognized a cause of action for disability-based workplace harassment under the ADA, modeling it after a similar claim under Title VII. Flowers, 247 F.3d 229. To succeed on this claim, a plaintiff must demonstrate

> 1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment complained of was based on her disability or disabilities; (4) that the harassment complained of affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt, remedial action.

Id. at 235–36.

The legal standard for workplace harassment in this circuit is, as Gowesky acknowledges, high. For workplace abuse to rise to the level of an actionable offense the "disability-based harassment must be sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment." Flowers, 247 F.3d at 236 (citations omitted).

8

In support of her claim that she suffered disability-based harassment, Gowesky cites, but does not discuss, two cases in which this court considered such claims. The first of these is McConathy v. Dr. Pepper/Seven-Up Corp., 131 F.3d 558, 564 (5th Cir. 1998). In this case we considered whether an employer's boorish comments toward an employee regarding the slow pace of the employee's recovery from her temporomandibular joint disease,[1] his reassignment of work away from her, and his insensitivity toward her need for surgery and time to recuperate would constitute "sufficiently pervasive disability-based harassment," id. at 563, if such an action existed. This court declined to hold that the ADA authorizes a discrimination-based workplace harassment claim, but concluded that, even if the ADA did authorize such an action, the employer's behavior "would not be sufficient as a matter of law to state a claim of hostile environment harassment." Id. at 564. "It is a simple fact that in the workplace, some workers will not get along with one another, and this Court will not elevate a few harsh words or 'cold shouldering' to the level of actionable offense." Id.

The second case, decided last year, presents an employer who radically changed the conditions of its employee's working conditions when it discovered that she had contracted HIV. Flowers,

---

[1] "McConathy states that when she approached [her employer] regarding the additional surgery, he became angry, and told her that she 'better get well this time,' and that he would 'no longer tolerate her health problems.'" Id. at 560.

9

247 F.3d 229. The employee's immediate supervisor — who had been close friends with her — ceased socializing with the employee, intercepted her telephone calls, and eavesdropped on her conversations. The company's president "became very distant" even though "they used to get along very well": He "refused to shake Flowers's hand and would go to great pains to circumvent her office to get to other parts" of the workplace. Id. at 236–37. In addition, Flowers, who had received outstanding work performance assessments, was "written up" twice and placed on ninety-day probation. Id. at 237. When the first probationary period expired, another one was imposed at a meeting in which the president uttered vulgar sexual accusations. Finally, Flowers was fired. This court concluded, first, that the ADA did indeed authorize disability-based workplace harassment claims and, second, that Flowers's treatment at the hands of her employer satisfied the standard for such.

In contrast to these two cases, Gowesky alleges that she spoke with Rimes after a staff meeting on February 8, 1999 and informed him that she was planning to return to work in May, upon recovery from her second carpal tunnel surgery. In response, Rimes expressed doubt regarding the legality of staffing the emergency room with a hepatitis-C-infected physician. He imposed as return-to-work conditions that she (a) present a full medical release from her physicians, (b) take a refresher course in emergency medicine,

10

and (c) submit to weekly blood samples.[2] He expressed his unwillingness to be treated by a dentist infected with hepatitis C or to allow Gowesky to suture his child. Gowesky also spoke at this time with Dr. Weldon, who allegedly imposed several conditions upon her: She must perform her work as before; she would not present the risk of infection to others; and she must inform patients and hospital staff about her successful treatment for the virus.[3] These are the only specific remarks to which Gowesky refers.[4]

It is not difficult to conclude on this slender evidence that no actionable disability-based harassment occurred. The conditions that Rimes and Weldon placed on Gowesky were, given the nature of Gowesky's work, eminently reasonable. Taken as a whole, the conditions amount to three requirements: that she not present the risk of infection to employees and patients, that she be able to reassure employees and patients of her continuing non-infectious status, and that she be fully capable of resuming her duties.

---

[2] This requirement was subsequently withdrawn. Gowesky agreed to the first two conditions.

[3] The hospital disputes that these statements were made, but we assume to the contrary for purposes of summary judgment.

[4] Nevertheless, she asserts, without quotation or paraphrase of their exact comments, that these two men continued to engage in harassing and offensive conduct over the next four months. Gowesky did stipulate at oral argument that later comments, though offensive, did not match Mr. Rimes's statements on February 8, 1999. "Mr. Rimes only made his most offensive comments early on, when Dr. Gowesky came to him and said 'I'm ready to go back to work.'" Their comments "caused Gowesky to question her own self-image and resulted in her seeking and receiving extensive psychological and psychiatric counseling." It is impossible to evaluate whether and to what extent any later statements by these men could have amounted to actionable harassment without any hint as to what they said.

Moreover, even if these conditions were "unreasonable," it is unclear that an "unreasonable" return-to-work condition could raise a genuine material fact issue concerning "harassment." Gowesky has failed to present any authority, and we have located none, for the proposition that an unreasonable condition alone constitutes "harassment" under the ADA or its model, Title VII.

Nor do the alleged hurtful comments meet the high standard set by Flowers. We are not inclined to extend this judicially created harassment action to behavior that occurred when Gowesky was not actually working at Ocean Springs. Both of the cases that Gowesky cites address the question of harassment in the workplace. This is because a harassment claim, to be cognizable, must affect a person's working environment. With the exception of the comments regarding suturing and dentistry allegedly uttered on February 8, 1999 and anything that might have been said (no details are alleged) at the staff meeting of March 22, all of the transactions between Gowesky and her supervisors occurred via telephone or in writing. She never returned to work during this period. Moreover, standing on their own, the quoted supervisors' comments simply do not reach the level of severity or pervasiveness that is required to create a fact issue on a hostile work environment claim. The comments are not nearly insensitive as those in McConathy, much less in Flowers.

The district court did not err in concluding, on summary judgment, that Gowesky had failed to establish her prima facie case of disability-based workplace harassment.

**C.    ADA Employment Discrimination Claim**

> This being a case brought under the Americans With Disabilities Act where only circumstantial evidence is offered to show the alleged unlawful discrimination, we apply the McDonnell Douglas, Title VII burden-shifting analysis. Under this framework, a plaintiff must first make a *prima facie* showing of discrimination by establishing that: (1) He is disabled or is regarded as disabled; (2) he is qualified for the job; (3) he was subjected to an adverse employment action on account of his disability; and (4) he was replaced by or treated less favorably than non-disabled employees. Once the plaintiff makes his prima facie showing, the burden then shifts to the defendant-employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. Once the employer articulates such a reason, the burden then shifts back upon the plaintiff to establish by a preponderance of the evidence that the articulated reason was merely a pretext for unlawful discrimination.

McInnis v. Alamo Community College Dist., 207 F.3d 276, 279–80 (5th Cir. 2000) (citations and footnotes omitted).

Considering here only the third element of her prima facie case, we conclude that the district court properly granted summary judgment to defendant Singing River on this claim. Because Gowesky failed — critically — to demonstrate that she suffered a disability-based adverse employment action, it is unnecessary to discuss the other elements. Gowesky alleges that Singing River failed to offer her an interim contract for the period between the expiration of her contract on August 28 and the transfer of the

13

emergency room staffing to ERG. This deed did not constitute an adverse employment action. Singing River demonstrated to the district court that its decision not to extend Gowesky an interim contract on October 1, 1999 was a product, not of any alleged discrimination, but, rather, of her repeated failures to return to work. On at least two occasions, Weldon placed Gowesky on the emergency room work schedule (with start dates, respectively, of June 1 and then August 1), only to receive last-minute telephone calls (May 31) or attorney-drafted correspondence (July 29) indicating that she would not, in fact, abide by her previous commitments. In light of the fact — uncontroverted by Gowesky — that all emergency room employees at work on October 1 received interim contracts, her assertions of discrimination wither away. Singing River asserted, without dispute by Gowesky, that if she had ever again appeared for work, she, too, would have received a contract.

## IV. CONCLUSION

This court does not doubt that Dr. Gowesky has suffered greatly since her accidental infection in February 1997. The discomforts occasioned by chemotherapy, surgery, and several years of involuntary unemployment could only have been aggravated by her supervisors' apparent lack of eagerness to take advantage of her likely considerable talents. This must be especially grating in light of the selfless manner in which her infection occurred.

14

Gowesky must recognize, nonetheless, that not all suffering — no matter how great, no matter how unmerited — gives rise to a compensable legal action. To obtain the right to present his case to a jury, a plaintiff must, at minimum, adduce evidence upon which a rational jury could, as a matter of law, find in his favor. As much as this court admires Gowesky's work and pities her suffering, she has, alas, failed to present such evidence. Accordingly, this court affirms the district court's grant of summary judgment to defendant Singing River.

**AFFIRMED.**