**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 10, 2012

No. 11-20784

Lyle W. Cayce
Clerk

JUNIAL DOUGLAS,

Plaintiff - Appellee

v.

SMITH INTERNATIONAL, INC.,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:11-CV-1924

Before DAVIS, OWEN, and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

This appeal arises from the district court's grant of summary judgment in favor of Plaintiff-Appellee Junial Douglas ("Douglas") based on the court's conclusion that Douglas's former employer, Smith International, Inc. ("Smith"), owed Douglas an end-of-service severance award pursuant to Saudi Arabian labor law. Smith argues on appeal that the district court erred in its interpretation of Saudi Arabia's Labor and Workmen Law ("Saudi Labor Law" or "Labor and Workmen Law") and the Rotation Assignment Agreement

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

("Agreement") that covered Douglas's final term of service in Saudi Arabia. For the reasons set forth below, we AFFIRM.

## I. Facts & Procedural History

The facts are generally undisputed. On December 30, 1997, Smith employed Douglas, a Missouri citizen, to work on a rotational basis in Saudi Arabia. During the thirteen years until his 2010 retirement,[1] Douglas worked in various positions and in different locations in Saudi Arabia. During this tenure, Smith made 401k and profit-sharing contributions on Douglas's behalf in the amount of $190,344.29.

On March 1, 2008, Douglas began working for Smith as a district manager in Saudi Arabia. Under the Agreement that governed this final term of employment, Douglas worked on a three month rotation, in which he would work for two months in the field, followed by one month off. Article 84 of the Saudi Labor Law requires employers to pay an end-of-service severance entailing a "half-month wage for each of the first five years and a one-month wage for each of the following years" of employment. LABOR AND WORKMEN LAW, Ministry of Labour, art. 84 (Saudi Arabia).[2] Douglas retired on December 31, 2010, and, pursuant to Article 84, requested severance pay in the amount of $144,657.45. Smith rejected Douglas's request, reasoning that it was not required to pay the end-of-service award because, *inter alia*, it had already provided Douglas benefits that exceeded what he was entitled to under Article 84.

Douglas sued for Smith's failure to comply with foreign law and breach of their employment Agreement. Based on a calculation using Douglas's last month of wages ($15,227.10) multiplied by nine and a half months' pay (five

---

[1] The district court stated that Douglas worked for Smith in Saudi Arabia for twelve years. The record shows that Douglas was actually working for Smith in Saudi Arabia for a full thirteen years—December 30, 1997 to December 31, 2010—but he did not receive his Saudi Arabian work permit until August 1998, twelve years and four months from his retirement date. The end-of-service calculation was thus conservatively based on "full" years of service, rather than adding a portion of a year to the base wage calculation.

[2] Any citation to "Article[s]" in this opinion references the Saudi Labor Law.

years of service at half-month's pay, and seven years of service at full-month's pay), the district court granted summary judgment in favor of Douglas for $144,657.45. Smith timely appealed.

## II. Standard of Review

"We review a district court's grant of summary judgment *de novo*, applying the same standards as the district court." *Noble Energy Inc. v. Bituminous Cas. Co.*, 529 F.3d 642, 645 (5th Cir. 2008). As such, summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation and internal quotation marks omitted). "Doubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party." *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 507 (5th Cir. 2003).

## III. Discussion

The issues presented by Smith's appeal are (1) whether the Agreement precludes or offsets end-of-service benefits otherwise available to Douglas under Saudi Labor Law; and if not, (2) whether the district court properly calculated the amount of that award.

### A. *The Rotating Assignment Agreement*

The parties agree that the Saudi Labor Law applies to Douglas's employment in Saudi Arabia. The parties also agree that they may not contract out of Saudi law as any condition in their Agreement "that contradicts the [Saudi Labor Law] shall be deemed null and void." LABOR AND WORKMEN LAW, art. 8. To that end, Article 8 allows parties to contract for a "release or settlement of the worker's rights arising from" the Saudi Labor Law, but only to the extent the Agreement is "more beneficial to the worker." *Id.* The key provision that Douglas alleges entitles him to benefits under Saudi Labor Law is Article 84:

3

Upon the end of the work relation, the employer shall pay the worker an end-of-service award of a half-month wage for each of the first five years and a one-month wage for each of the following years. The end-of-service award shall be calculated on the basis of the last wage and the worker shall be entitled to an end-of-service award for the portions of the year in proportion to the time spent on the job.

Smith acknowledges this provision but argues on appeal that Douglas agreed to a "more beneficial" benefits package in the form of 401k and profit-sharing contributions, and thus is not entitled to an end-of-service award. There is no dispute that Smith paid Douglas $190,344.29 in benefits during Douglas's tenure in Saudi Arabia—an amount greater than what Douglas is eligible to receive under Article 84's end-of-service award. Douglas argues, however, that the Agreement does not call for such a compromise.

The Agreement stipulates that it is governed by Texas law. Therefore, we must construe the Agreement so as to effectuate the parties' intent as it has been expressed in light of the circumstances present when the contract was entered. *See, e.g., David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 451 (Tex. 2008). To accomplish this end, we must accord the terms of the Agreement their plain meaning, *see Lyons v. Montgomery*, 701 S.W.2d 641, 643 (Tex. 1985), and view each clause in light of the entire agreement so that no provision will be rendered meaningless, *see, e.g., Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). If contract language can be given a definite "meaning or interpretation, then it is not ambiguous and we construe it as a matter of law." *Tex. Farm Bureau Mut. Ins. Co. v. Sturrock*, 146 S.W.3d 123, 126 (Tex. 2004). "An ambiguity does not arise simply because the parties offer conflicting interpretations" of the contract language. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). Rather, an agreement is only ambiguous if it "is susceptible to two or more reasonable interpretations." *Id.*

The Agreement was entered to effectuate the terms and conditions of Douglas's employment as district manager, effective March 1, 2008. Though the parties agree that the language of the Agreement is unambiguous, they disagree

4

about its meaning.  We agree that the provisions at issue are only susceptible to one reasonable interpretation and are thus unambiguous.

Smith's argument on appeal focuses on the language of the "Termination" and "Further Conditions of Employment" sections of the Agreement.  According to Smith, these provisions indicate that Douglas agreed he would not be entitled to Saudi end-of-service benefits if the benefits provided by Smith over the course of his employment exceeded the amounts due under Article 84, and in the alternative, that any end-of-service payment due to Douglas must be offset by benefits paid to Douglas under the Agreement.  In neither instance, however, does the Agreement's language express such an intent to limit Douglas's post-employment rights under Saudi law.

### 1. *"Further Conditions of Employment" Provision*

We first look to the "Further Conditions of Employment" section, which provides in relevant part:

> A.  <u>Special Employment Contracts or Agreements</u>: *As directed by the Company, you may be required to sign Special Employment Contracts or Agreements at your assignment location.* If such contracts or agreements are deemed necessary or appropriate, the Company expects your full assistance and cooperation with local representatives to successfully fulfill those requirements. If such special contracts or agreements should cause a conflict with the Company's policies, procedures or benefits, then you must notify your manager immediately of any such conflict and promptly assist with its resolution as directed by the Company. *Under no circumstances will the compensation or benefits of your foreign assignment exceed the greater of those provided by the Company or those required by local laws.*

(emphasis added).  Smith argues that the last sentence of this subsection indicates that Douglas agreed to forego his Saudi end-of-service award for greater benefits provided by Smith.

Smith, however, reads this sentence entirely out of context.  The subsection is  titled "Special Employment Contracts or Agreements," and the first sentence notifies Douglas that local laws may require him to enter special

5

agreements in order to work in the area.  Indeed, the subsection as a whole requires Douglas to cooperate with Smith and local officials in order to meet local labor requirements at the start of Douglas's assignment to ensure Douglas's employment eligibility.  The limitation that Smith focuses on must, therefore, be read in light of this prefatory language.  *See Coker*, 650 S.W.2d at 393.  Smith cannot simply take a general statement of limitation out of context in an attempt to expand its application.  *See Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133-34 (Tex. 1994) ("For example, when a contract provision makes a general statement of coverage, and another provision specifically states the time limit for such coverage, the more specific provision will control.").  Smith's interpretation, however, wrongly attempts to compare employee benefits provided Douglas *during his tenure* with *severance* payments mandated by local law upon completion of his employment.

Ultimately, Smith's reliance on this subsection is unavailing because the language relates to limiting Douglas's compensation and benefits, but nowhere contemplates foreign severance or pension mandates.  Indeed, the end-of-service award is a right granted employees under Saudi Labor Law, not a "Special Employment Contract or Agreement."  This provision does not aid Smith here.[3]

### 2. *"Termination" Provision*

Smith next argues that the Agreement's "Termination" provision allows Smith to offset any settlement payments required under local law with benefits it already provided to Douglas.  That provision reads:

> **Termination:**
> . . .
> Termination will require immediate settlement of all outstanding expenses, advances, taxes and other local financial issues.  In some countries, local employment conditions require settlement payments under local law.  *If such payments are required, these payments will*

---

[3] It is notable that the Agreement here does include a "Benefits" section.  If it were Smith's intent to provide Douglas employment benefits in lieu of foreign severance payments, that section is the most logical place to have so provided.

*offset any compensation and benefits due to you from the Company. You hereby consent to this offset as determined by the Company. . . .*

*Upon termination, you will be entitled to receive your base salary and field earned incentives through your last day of work,* subject to any required or authorized deductions or offsets**.**

(emphasis added).

Smith's reasoning is flawed. First, Smith again reads the relevant text completely apart from its surrounding language. Smith assumes that this language indicates Douglas's consent to offset local settlement payments against any compensation it has ever provided to Douglas. Even assuming that this provision's reference to "settlement payments" refers to the end-of-service award at issue, Smith ignores the fact that the offsetting payments only apply to "compensation and benefits due to [Douglas] from [Smith]." Not only is this language forward-looking, but the compensation and benefits due to Douglas are exemplified as "base salary and field earned incentives through [the] last day of work," and that Douglas is "entitled to receive." Just as Douglas cannot claim he is still entitled to compensation he already received, Smith cannot argue that Douglas's past compensation and benefits may offset his future severance because it was once "due to [him]."

Though Saudi Labor Law clearly does not control our contract interpretation here, it contains provisions that clarify how the "Termination" provision operates. Indeed, Article 88 specifically allows for an offset much like the one in the parties' Agreement. That article notes that an "employer may deduct any work-related debt due to him from the worker's [end-of-service entitlements]." The first sentence of the "Termination" provision reads similarly, requiring an employee to settle outstanding "expenses, advances, taxes and other local financial issues." Indeed, Article 92 contemplates several scenarios where an employer may deduct certain costs from an employee's wages, including: repayment of loans, social insurance contributions, worker

7

contributions to thrift funds, home ownership program installments, and fines imposed on the worker for workplace violations.

The Agreement's "Termination" section is clearly a windup provision aimed at limiting Smith's liability for the range of payments it may be obligated to make in favor of an employee. Indeed, the Agreement nowhere mentions substitution of benefits provided during Douglas's tenure for end-of-service benefits under Saudi law. Moreover, Smith's interpretation is simply backwards. The Agreement contemplates the possibility that "[severance payments] will offset any compensation and benefits due." This is significantly different than Smith's position: that compensation and benefits once due may offset a foreign settlement award. Bearing in mind that our primary goal is to uncover the intent of the parties when they entered the contract, we find Smith's construction unreasonable. We conclude that the district court did not err in rejecting Smith's argument on this point.

## B. End-Of-Service Award Calculation

Article 84 of the Saudi Labor Law provides that "[t]he end-of-service award shall be calculated on the basis of the last wage and the worker shall be entitled to an end-of-service award for the portions of the year in proportion to the time spent on the job." The district court determined that Douglas's "last wage" included "basic pay, hazardous work pay, housing and vehicle allowances," amounting to $15,227.10.

Smith argues that the wage determination should exclude housing and vehicle allowances. Though Article 84 does not specify exactly what "last wage" entails, "wage" is defined in the Saudi Labor Law. Article 2 breaks a worker's wage into "basic wage" and "actual wage." Basic wage is "[a]ll that is given to the worker for his work . . . regardless of the kind of wage or its method of payment . . . ." Actual Wage, on the other hand, is "basic wage plus all other due increments decided for the worker for the effort he exerts at work or for risks he encounters in performing his work, or those decided for the worker for the work

8

under the work contract or work organization regulation." The default "Wage" is then defined simply as "actual wage."

Smith contends that the housing and vehicle allowances afforded Douglas should not be included in the base "wage" used to calculate Douglas's end-of-service award because those allowances are not afforded Douglas "for his work." This argument, however, relies on the language provided in the more restrictive "basic wage" definition. As noted, the default "wage" under Saudi Labor Law is "actual wage" and includes "all other due increments . . . decided for the worker for the work under the work contract or work organization regulation."[4] An example provided in the definitions illuminates our inquiry, noting that actual wage includes "[i]ncrements that may be granted in accordance with the standard of living or to meet family expenses." LABOR AND WORKMEN LAW, art. 2. This example certainly includes housing and vehicle allowances, and the district court was thus correct in including those payments in Douglas's last wage calculation.

Smith also argues that the district court erred in making its calculations based on Douglas's total service in Saudi Arabia rather than his last rotation as District Manager. Douglas worked under the Assignment contract from March 1, 2008, to December 31, 2010—two years and ten months. Douglas's entire tenure with Smith pursuant to a Saudi work visa spanned from August 1998 to December 2010—twelve years and four months.

Smith's construction of Article 84 is untenable. Article 37 of the Saudi Labor Law contemplates the duration of foreign employment: "The work contract for non-Saudis shall be written and of a specified period. If the contract does not

---

[4] Though not effective here, Article 86 provides a solitary exception to the compensation that should be included in the end-of-service last wage. That exception allows the employer and employee to agree to exclude from the last wage "all or some of the commissions, sales percentages, and similar wage components paid to the worker which are by their nature subject to increase or decrease." This exception is enumerated in examples one and four of the definition for "actual wage" under Article 2, meaning that Saudi Labor Law contemplated the end-of-service award to parallel "actual wage," not "basic wage."

specify the duration, the duration of the work permit shall be deemed as the duration of the contract." Nowhere does the record show, nor does Smith contend, that any of Douglas's work contracts during his thirteen years of service were for a specified time period. The duration of Douglas's employment must therefore be determined by the length of his work visa.[5]

Nor does Smith argue that there was ever an interruption in Douglas's thirteen years of service that would constitute a break sufficient to sever Douglas's compensable years of service. Article 2 defines "Continuous Service" as "[u]ninterrupted service of a worker for the same employer or his legal successor from the starting date of service." Douglas received his Saudi Arabian work visa in August 1998, thus triggering the "starting date of service."[6] There is no dispute that Douglas ever stopped performing work for Smith, notwithstanding changes in job title or specific contractual arrangements.

If we were to restrict an end-of-service award to time spent working under individual contracts, it would provide Smith an end-around to Saudi-mandated severance payments because Article 84 explicitly limits end-of-service awards to work that lasts longer than two years. Not only would it be unreasonable and out of course for an employer to provide an end-of-service award after the completion of every contract performed in Saudi Arabia, it would enable a company like Smith to simply transfer its employees to new positions within the company every two years and never be required to pay a severance award regardless of how long the employee is stationed in Saudi Arabia. Ultimately,

---

[5] Smith itself contemplated the end of the employment relationship to coincide with the maintenance of Douglas's work visa. In Human Resources information sent to Douglas, Smith stated to Douglas that his "work VISA has been sponsored by [Smith] and now that this employment relationship has ended, your VISA will be cancelled."

[6] Though "Service" is not defined, the plain meaning of the word must constitute employment when Douglas began working for Smith in Saudi Arabia. Indeed, Webster's defines "service" in this context as "the work performed by one that serves." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 1070 (10th ed. 1994); *see also Parsons v. W. Va. Works Hourly Emps. Pension Plan*, 879 F.2d 130, 130-31 (4th Cir. 1989) (per curiam) (finding that employees' service started on their respective dates of hire).

Article 84 contemplates a severance payment to be made "[u]pon the end of the work relation," not at the end of the rotation.  No reasonable construction of this provision would consider Douglas's work relationship with Smith to have ended each time he was transferred within Saudi Arabia, or promoted to a different managerial position.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the ruling of the district court granting summary judgment in favor of Plaintiff-Appellee Douglas.