A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
(a) the servant
(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or
(ii) is using a chattel of the master, and
(b) the master
(i) knows or has reason to know that he has the ability to control his servant, and *1141 (ii) knows or should know of the necessity and opportunity for exercising such control.
RESTATEMENT (SECOND) OF TORTS § 317 (1965).
Applying this test, the court first examines D.C.'s argument that El Matador had a duty to prevent Jennifer from engaging in illegal sexual conduct with him. Under the initial inquiry of section 317, none of this conduct occurred on El Matador's premises, at a location where Jennifer had access because of her agency relationship with El Matador, or while using a chattel belonging to El Matador. All of the sexual acts occurred either at Jennifer's home or her parent's residence. D.C. has presented evidence that the Hasratian residence has an office in the basement where El Matador business, such as bookkeeping and monitoring of surveillance cameras, is conducted. But regardless of whether the home office would be considered "a premises in possession" of El Matador, the entire home would not attain this status. Because Jennifer's tortious sexual conduct occurred in the living quarters of the Hasratians' home and not in the home office, El Matador had no duty to control Jennifer's harmful behavior.
Next, the court examines D.C.'s assertion that El Matador had a duty to prevent Jennifer from providing alcohol to him. D.C. has presented evidence that on one occasion Jennifer gave him alcohol at the restaurant. In addition, there is some evidence that Jennifer took alcohol belonging to El Matador and gave it to D.C. at her home. Thus, D.C. provided evidence that Jennifer was "using a chattel of the master" when she furnished him alcohol in her home.
Under the second step of section 317, however, there is no indication that El Matador knew or should have known of a need to control Jennifer's conduct related to providing alcohol to minors. D.C. presented evidence of her parent's knowledge that Jennifer had problems with her own consumption of alcohol in the past, including DUI arrests and car accidents caused by intoxication. But there is no evidence that El Matador knew or had reason to know that Jennifer was giving alcohol to minors at work or that she was stealing alcohol so that she could provide it to a minor.
Because there is no evidence before the court that could satisfy all of the requirements of section 317, El Matador is entitled to summary judgment on D.C.'s negligent supervision claim.
3) Direct Liability for Negligent Infliction of Emotional Distress
Finally, D.C. has presented no argument or evidence to support a theory of direct liability for negligent infliction of emotional distress against El Matador. There is no evidence that an El Matador agent operating within the scope of his or her employment engaged in any extreme conduct that "involved an unreasonable risk of causing the distress." Carlton , 323 P.3d at 585 (citation omitted).
In sum, because D.C. has not presented evidence that would support either a negligence claim or a negligent infliction of emotional distress claim against El Matador, it is entitled to summary judgment as to these causes of action.
B. The Hasratians' Summary Judgment Motion
D.C. alleges that the Hasratians are liable for their daughter's misconduct under two broad theories. First he argues that because the Hasratians gave Jennifer a key to their house, Jennifer became the Hasratians' agent and they are liable for Jennifer's misconduct with D.C. while they were in the home. Second, D.C. alleges that he was an invitee to the Hasratian's *1142 home and that they are liable under a premises liability theory.
1) Agency Theory of Liability
The Hasratians gave Jennifer a key and access codes to their home so that she could pick up the mail and watch over the house when they were gone. On several occasions, Jennifer brought D.C. to the Hasratians' home while they were out of town. While they were in the residence, Jennifer gave D.C. alcohol and engaged in illegal sexual activity with him. D.C. argues that Jennifer became the Hasratians' agent while they were out of town, and that they are therefore subject to respondeat superior liability for her actions while inside the home.
This court need not determine whether Jennifer became an agent for the Hasratians because she acted outside the scope of any potential agency relationship. As discussed above, a principal is only liable when the agent is acting within the scope of the agency relationship. M.J. , 371 P.3d at 30-31. The only agency relationship that could arguably exist here related to picking up mail and watching over the house in the Hasratians' absence. Providing alcohol to and having sex with a minor would be outside the scope of any such agency relationship. Instead, these acts served only Jennifer's personal gratification. See Jackson , 891 P.2d at 1391 ; J.H. ex rel. D.H. , 840 P.2d at 123 ; Birkner , 771 P.2d at 1058.
2) Premises Liability Theory
Although poorly developed in his briefing, D.C. raises in passing that the Hasratians are subject to premises liability for the psychological injuries he suffered at Jennifer's hands while in the Hasratian home. Under a premises liability theory, a "possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land." Hale v. Beckstead , 116 P.3d 263, 266 (Utah 2005) (quoting RESTATEMENT (SECOND) OF TORTS § 343 (1965) ). But D.C. has failed to identify a dangerous condition of the Hasratians' property or any physical harm caused by such a condition. D.C.'s premises liability theory, therefore, fails as a matter of law.
Because both D.C.'s agency and premises liability theories are unavailing, the court grants summary judgment for the Hasratians and their trusts as to the negligence cause of action and the negligent infliction of emotional distress claims.
II. Hostile Work Environment and Retaliation Claims
A. Hostile Work Environment
Title VII makes it unlawful for an employer to "discriminate against any individual ... because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1). To establish a hostile work environment claim under this statute, a plaintiff must show that "(1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) [due to the harassment's severity or pervasiveness], the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment." Harsco Corp. v. Renner , 475 F.3d 1179, 1186 (10th Cir. 2007) (alteration in original) (citation omitted).
"For a hostile environment claim to survive a summary judgment motion, 'a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " Penry v. Fed. Home Loan Bank of Topeka , 155 F.3d 1257, 1261 (10th Cir. 1998) (citation omitted). "[T]he plaintiff must make a showing that the environment was both *1143 objectively and subjectively hostile ...." Id.
El Matador argues that summary judgment on D.C.'s hostile work environment claim is appropriate for two reasons. First, it argues that Jennifer's actions were not severe or pervasive enough to create an abusive working environment. Second, it argues that El Matador cannot be held liable because it did not have actual or constructive knowledge of Jennifer's actions.
1) Severity and Pervasiveness of Jennifer's Conduct
El Matador points to evidence that Jennifer never touched D.C. inappropriately while he was at the restaurant and that the only possible inappropriate behavior on Jennifer's part was "innocent flirting." El Matador argues that this evidence could not be interpreted as creating a hostile work environment as a matter of law because it was not severe or pervasive.
El Matador's rather limited view of the scope of the evidence of a hostile working environment appears to be premised upon an assumption that any actions that Jennifer took towards her subordinate outside of work could not contribute to a hostile working environment. "But harassment does not have to take place within the physical confines of the workplace to be actionable; it need only have consequences in the workplace." Lapka v. Chertoff , 517 F.3d 974, 983 (7th Cir. 2008) ; see also Ellison v. Brady , 924 F.2d 872, 883 (9th Cir. 1991) ("We believe that in some cases the mere presence of an employee who has engaged in particularly severe or pervasive harassment can create a hostile working environment.").[5]
There is evidence here that Jennifer gave alcohol to D.C. at her home and that he became drunk and passed out on a bed. [D.C. dep., p. 48] D.C. woke up to Jennifer unzipping his pants and engaging in oral sex with him. Jennifer engaged in illegal sexual conduct with D.C., a minor, many times thereafter outside of work. D.C. felt awkward about having sex with his boss, and she seemed upset when he told her no. [D.C. decl. ¶ 17] He was also worried that if Jennifer became upset with him she would "take it out on [him] at work." [D.C. decl. ¶ 19]
Based on this evidence, there is a dispute of material fact as to whether Jennifer's conduct was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive *1144 working environment." Penry , 155 F.3d at 1261 (citation omitted). A jury could find that Jennifer's statutory rape of D.C. outside of work was severe enough to create an abusive environment while he was at work. See Kramer v. Wasatch Cty. Sheriff's Office , 743 F.3d 726, 743 (10th Cir. 2014) ("[R]ape is inarguably a severe form of sexual harassment ...."); Lapka , 517 F.3d at 983 ("Rape is also, by definition, a form of harassment based on sex.").
In addition, D.C. states in his declaration that Jennifer made sexual comments to him at work, including "It's hard to work with you because I want to f--k you." [D.C. decl., ¶ 14.] Viewed in the light most favorable to D.C., this evidence also supports a hostile work environment claim.[6]
2) El Matador's Knowledge of a Hostile Working Environment
When a hostile work environment claim is based upon an employer's negligence or recklessness in failing to stop sexual harassment on the part of a coworker, "the plaintiff must establish that the employer had actual or constructive knowledge of the hostile work environment but did not adequately respond to notice of the harassment." Adler v. Wal-Mart Stores, Inc. , 144 F.3d 664, 673 (10th Cir. 1998) (citation omitted). El Matador seizes upon this legal principle and argues that it cannot be liable for a hostile work environment as a matter of law because there is no evidence that El Matador had actual or constructive knowledge of Jennifer's inappropriate behavior.
El Matador's argument, however, ignores the distinction between cases involving sexual harassment by a coworker and cases involving sexual harassment by a supervisor. "If the harasser is a supervisor rather than merely a co-worker, ... the employer may be vicariously liable for the conduct, depending on the circumstances." Kramer , 743 F.3d at 737. "If the supervisor's harassment culminates in a 'tangible employment action,' the employer is strictly liable for sex discrimination, with no defense." Id. (citation omitted). "If no tangible employment action occurs, the employer may still be vicariously liable for the supervisor's harassment if the plaintiff proves the harassment was severe or pervasive, and the employer is unable to establish the affirmative defense announced in Faragher v. City of Boca Raton ...." Id. (citation omitted). "This defense has 'two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.' " Id. at 745 (citation omitted).
There is ample evidence in this case that Jennifer was D.C.'s supervisor. She was a manager of El Matador. She hired D.C., and she threatened to fire him if he did not work his shift during his second hospitalization. El Matador, however, has not argued that it is entitled to summary judgment under a supervisor liability analysis. It has not addressed whether there is evidence that D.C. was subjected to a tangible employment action, nor has it argued that it had a sexual harassment policy or *1145 that D.C. unreasonably failed to take advantage of such a policy.
Because El Matador has neglected to make any argument regarding supervisor liability, it is not entitled to summary judgment. Even if it could show that there is no evidence that it knew about Jennifer's inappropriate behavior, it has failed to demonstrate that it would avoid liability as a matter of law if Jennifer is deemed to be a supervisor.
Thus, both of El Matador's arguments for summary judgment on the federal hostile work environment claim fail. El Matador's motion for summary judgment on this claim is denied.
B. Retaliation
"A plaintiff establishes a prima facie case of retaliation by showing: (1) he or she engaged in protected opposition to discrimination; (2) he or she was subject to adverse employment action; and (3) a causal connection exists between the protected activity and the adverse action." Kendrick v. Penske Transp. Servs., Inc. , 220 F.3d 1220, 1234 (10th Cir. 2000).
D.C. argues that he engaged in protected opposition to discrimination by cooperating with the police investigation into Jennifer's illegal sexual conduct towards him. He also argues that when his mother told Jennifer that she "had some explaining to do" to the police that she was opposing discrimination on behalf of her minor son. [Pl. exh. 7, ¶ 12] D.C. further asserts that he was subjected to an adverse employment action by being terminated from his employment when Jennifer subsequently sent his mother a text stating: "Tell your crazy kid to leave me alone." [Pl. exh. 7, ¶ 14] D.C. contends that this text message was a constructive dismissal from his employment caused by protected opposition to discrimination.
El Matador argues, however, that there is no causal link between a protected activity and an adverse employment action in this case because the undisputed evidence shows that D.C. either quit or was fired before the police investigation began and before D.C.'s mother threatened Jenifer on behalf of her son. D.C. testified in his deposition that during his second hospitalization for attempting suicide Jennifer sent D.C.'s mother a text message stating that he had to be at work that night or he would be replaced. [D.C. dep., p. 180] D.C.'s mother told D.C. about the text message, but because of his hospitalization he could not go to work that evening. [D.C. dep., p. 180] D.C. testified that based upon this text message, he never went back to work. [D.C. dep., p. 181] He further confirmed that his employment "ended around July 22nd of 2013," the date of his second hospitalization.[7] [D.C. dep., pp. 14, 85] D.C.'s cooperation with the police investigation and his mother's threat to Jennifer that she had some explaining to do occurred after Jennifer's sexual abuse came to light some time later during a third hospitalization. D.C.'s deposition testimony, therefore, demonstrates that there can be no causal link between the protected activity of reporting Jennifer's criminal behavior and an adverse employment action because he was no longer an employee when he engaged in the protected activity.
After his deposition, D.C. produced a declaration that proffered a different timeline for the termination of his employment at El Matador. The declaration states that after D.C. participated in the police investigation, Jennifer sent a text message to his mother stating: "Tell your crazy kid to *1146 leave me alone." [D.C. decl., ¶ 37] D.C. further declared:
Jennifer Hasratian's communications, including "Tell your crazy kid to leave me alone", was [sic] understood and in context of the discussions [sic] that my employment at El Matador was terminated by El Matador through Jennifer Hasratian. I did not voluntarily quit my employment at El Matador.
Jennifer Hasratian's and El Matador's "Tell your crazy kid to leave me alone" and termination of my employment was in retaliation for [D.C.'s mother] having confronted Jennifer Hasratian and El Matador including on my behalf complaining to her and El Matador about the sexual text messages ... and making complaints to the Ogden City Police Department about the unlawful sexual harassment, hostile work environment, and unlawful sexual activity with me, a minor.
[D.C. decl., ¶¶ 38-39] The declaration did not address or attempt to explain D.C.'s statements in the deposition that his employment with El Matador came to an end on an earlier date.
In order to determine whether D.C. has produced viable evidence that would create a dispute of material fact as to whether he was fired after he cooperated with the police investigation, the court must decide whether to disregard his declaration under the sham affidavit rule. Under this rule, a court may disregard an affidavit that contradicts prior deposition testimony. Knitter v. Corvias Military Living, LLC , 758 F.3d 1214, 1218 n.3 (10th Cir. 2014). But a "witness' affidavit will not be automatically excluded because it conflicts with the witness' earlier or later [testimony]." S.E.C. v. Smart , 678 F.3d 850, 856 n.6 (10th Cir. 2012) (alteration in original) (citation omitted). The court must also weigh three factors to determine if the affidavit constitutes an attempt to create a sham fact issue, including whether "(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain." Knitter , 758 F.3d at 1218 n.3 (citation omitted).
The threshold requirement of a direct contradiction between deposition testimony and an affidavit is met in this case. D.C. clearly testified that his job at El Matador ended around the time of his second hospitalization. But his later declaration claims that Jennifer fired him at a later date. Thus, this court must weigh the three factors in determining whether the contradictory affidavit constitutes an attempt to create a sham fact issue. The first consideration disfavors the exclusion of D.C.'s declaration. Although his attorney was present, plaintiff's counsel did not cross-examine him during the deposition. The second and third considerations, however, weigh heavily in favor of deeming a portion of the declaration to be a sham affidavit. As D.C. was giving testimony as a percipient witness to the timing of his separation from El Matador, he had access to all pertinent evidence when he testified in the deposition. See Franks v. Nimmo , 796 F.2d 1230, 1237 (10th Cir. 1986) (concluding that an affidavit created only a sham issue of fact because the deponent, "as a participant in the alleged conversations ... clearly had access to the relevant evidence at" the time of the deposition). Nor was the declaration based upon newly discovered evidence. Moreover, the declaration does not attempt to clarify an ambiguity or confusion in the deposition testimony.
Balancing these three considerations, the court finds that D.C.'s declaration creates *1147 only a sham issue of fact. The court, therefore, disregards the portion of D.C.'s affidavit in which he declares that Jennifer constructively fired him after he cooperated with the police investigation. Absent any other evidence that El Matador subjected D.C. to an adverse employment action subsequent to a protected activity, there can be no proof of causation. Therefore, El Matador is entitled to summary judgment on D.C.'s retaliation claim.
III. Wrongful Discharge
"An at-will employee whose employment has been terminated in violation of a clear and substantial public policy may sue for wrongful termination." Ray v. Wal-Mart Stores, Inc. , 359 P.3d 614, 620 (Utah 2015). The Utah Supreme Court has
identified four categories of public policies that may provide a basis for a wrongful termination claim: (i) refusing to commit an illegal or wrongful act, such as refusing to violate the antitrust laws; (ii) performing a public obligation, such as accepting jury duty; (iii) exercising a legal right or privilege, such as filing a workers' compensation claim; or (iv) reporting to a public authority criminal activity of the employer.
Id. (emphasis removed) (citation omitted).
In his sixth cause of action, D.C. alleges that he was wrongfully terminated (either formally or constructively) for reporting Jennifer's criminal activity in derogation of Utah's public policies. But D.C.'s wrongful termination claim fails as a matter of law for the same reason that his retaliation claim fails. As noted above, there is no competent evidence that El Matador fired D.C. after he reported a crime to the police. Instead, the evidence only supports the proposition that he no longer worked at El Matador by the time that D.C. cooperated in the investigation. There can be no causal connection between his termination and the activity protected by Utah's public policy-reporting the criminal activity of an employer. El Matador, therefore, is entitled to summary judgment on D.C.'s wrongful termination claim.[8]
CONCLUSION
The court GRANTS IN PART AND DENIES IN PART the motion for summary judgment filed by defendants El Matador, Inc., El Matador Restaurante & Cantina, and El Matador Restaurant (collectively, El Matador). (Docket 60). Summary judgment is GRANTED to El Matador as to the first cause of action for negligence, sixth cause of action for constructive wrongful discharge, and seventh cause of action for negligent infliction of emotional distress. Summary judgment is also GRANTED to El Matador as to the retaliation claim contained in the fifth cause of action. Summary judgment is DENIED as to the federal hostile working environment claim in the fifth cause of action.
The court GRANTS the motion for summary judgment filed by defendants Tony Hasratian, Paula Hasratian, the Tony Hasratian Living Trust, and the Paula Hasratian Living Trust (collectively, the Hasratians). (Docket 59). Summary judgment is GRANTED to the Hasratians as to the first cause of action for negligence and the *1148 seventh cause of action for negligent infliction of emotional distress.
Therefore, the causes of action that remain in this case include all of the claims pled against Jenifer Hasratian and the federal and state law hostile work environment claims pled against El Matador.

The Fifth Circuit has rejected a hostile work environment claim based upon alleged harassment that occurred outside of work hours. Gowesky v. Singing River Hosp. Sys. , 321 F.3d 503, 511 (5th Cir. 2003). In that case, an emergency room worker contracted hepatitis C and took a two-year leave of absence from work. Id. at 506. She later told her supervisors that she wanted to return to her work in the emergency room. Id. Her supervisors expressed doubts as to whether she could safely work in an emergency room and placed conditions upon her return. Id. at 506-07. The employee never returned to work and sued the hospital for a hostile working environment. Id. at 507. The Fifth Circuit affirmed summary judgment in favor of the hospital, reasoning that the supervisors' communications to the plaintiff setting the conditions of her return did not constitute harassment. Id. at 510. The court also noted that most of the allegedly harassing communications occurred outside of work via telephone or in writing and did not affect her working environment. Id. at 510-11. Gowesky is readily distinguishable from both this case and authorities from other circuits that hold that out-of-work harassment can lead to a viable claim if it affects the workplace. The Gowesky court noted that the plaintiff never returned to work after the allegedly harassing statements were made. Id. Thus, it was impossible for the allegedly harassing behavior to affect the plaintiff's work environment because she never returned to work. The facts presented in Gowesky are different from the facts of this case, where D.C. worked with Jennifer after the alleged out-of-work harassment occurred.

At oral argument, El Matador suggested that the court disregard much of D.C.'s declaration because it contains factual allegations that were not made during his deposition. But this court may only ignore a declaration if it contradicts earlier deposition testimony. Hernandez v. Valley View Hosp. Ass'n , 684 F.3d 950, 956 n.3 (10th Cir. 2012). Including information in a declaration that was not mentioned during a deposition is not the same as contradicting prior deposition testimony.

Notably, D.C. also alleged in his complaint that he was constructively terminated from his employment on or about July 22, 2013. [Compl. ¶ 103]

D.C. captioned his sixth cause of action as follows: "Constructive Wrongful Discharge and Breach of the Covenant of Good Faith and Fair Dealing." But underneath this caption, D.C. does not allege any facts relevant to a breach of the covenant of good faith and fair dealing claim, nor does he even mention such a claim. D.C.'s inclusion of a phrase in the title to a cause of action is insufficient to raise an independent claim as there are no assertions of fact to support the claim. Because D.C. only pled a wrongful termination claim under his sixth cause of action, it shall be dismissed in its entirety.